**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JONATHAN HAAS, M.D.,

      Plaintiff,

          v.

WYOMING VALLEY HEALTH CARE
SYSTEM,

      Defendant.

NO. 3:03-CV-1966

(JUDGE CAPUTO)

**<u>MEMORANDUM</u>**

Before me are Plaintiff Dr. Jonathan Haas' request for equitable relief pursuant to the Americans with Disabilities Act ("ADA") and motion for attorney's fees. (Doc. 137, 125.) Also before me is Defendant Wyoming Valley Health Care System's ("WVHCS") post-trial motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. (Doc. 124.)

Judgment as a matter of law will be entered in favor of the Defendant on the Rehabilitation Act claim because Plaintiff Dr. Haas posed a "direct threat" to the health and safety of the patients in WVHCS. Because Defendant WVHCS is entitled to judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, I do not reach the Defendant's motion for a new trial. As the same analysis applies for a "direct threat" pursuant to the Rehabilitation Act and the ADA, Plaintiff's request for equitable relief will be denied. As Plaintiff is not a prevailing party, Plaintiff's motion for attorney's fees will also be denied.

**BACKGROUND**

Dr. Haas brought suit against WVHCS under the ADA and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794, seeking equitable relief including reinstatement and damages, respectively.  A trial was held before a jury on the Rehabilitation Act claim beginning April 2, 2007, and after five days of trial, the jury returned a verdict in favor of Dr. Haas in the amount of $250,000.00.  (Doc. 120.)

The issues for legal relief pursuant to the Rehabilitation Act turn on essentially the same questions which must be decided for equitable relief pursuant to the ADA.  These questions are whether Dr. Haas could perform as an orthopedic staff surgeon at the hospital with or without a reasonable accommodation, and, if so, did he pose a direct threat to the patients he might encounter in the operating room at the hospital.

Dr. Haas has a disability, bipolar disorder, and his disability had a substantial effect on the major life activity of thinking.  He could not perform as an orthopedic staff surgeon at the hospital without a reasonable accommodation, but he could do so with a reasonable accommodation.  The accommodation made by the WVHCS as a condition to reinstatement was reasonable.  Lastly, in any, any event, the WVHCS met its burden of proof in demonstrating that Dr. Haas posed a direct threat to patients he might encounter in the operating room at the hospital without adherence to the conditions of accommodation proffered by WVHCS.

The salient facts are as follows.  Dr. Haas was a well-educated and trained physician and orthopedic surgeon.  Early in his career, while a resident in 1994, he suffered from an episode then diagnosed as a bipolar disorder.  He received treatment and continued his career without recurrence until 1999 when he suffered another

episode.  After a similar diagnosis, he underwent psychiatric treatment and took medication.  He recovered, or went into recession.  In 2000, he wished to return to northeastern Pennsylvania and entered the employ of Dr. Michael Raklewicz, an orthopedic surgeon in Wilkes-Barre, Pennsylvania.  He sought orthopedic privileges at Wilkes-Barre General Hospital, and in this process his mental illness and the episodes occasioned thereby became known to the hospital.  Dr. Thomas L. Campbell required a psychiatric clearance of Dr. Haas, and Dr. Haas, in January 2001, secured such a clearance from Dr. Matthew Berger, a psychiatrist selected by Dr. Haas.  Thereafter, Dr. Haas was given credentials as an orthopedic surgeon at the hospital.[1]

On May 23, 2001, while performing a total knee replacement in the operating room at the hospital, Dr. Haas suffered an episode engendered by his mental illness (bipolar disorder).  Part way into the surgery, he demonstrated confusion in his thought process to the extent that the assistant and the prosthesis manufacturer's representative gave him instructions on the performance of the procedure.  In the course of the episode, he was distracted from the procedure and engaged in conversation with a student unrelated to the surgery.  The evidence was abundant that he was confused in his thought processes such that he could not perform the operation without specific instructions and guidance from others.

After the completion of the knee replacement, Dr. Haas continued to exhibit behavior that was consistent with a confusing thought process.  He asked the same question five times of two other physicians who were puzzled by his behavior.  This was

_____

[1] Dr. Haas had temporary privileges as of August 2000.

3

observed by Dr. Raklewicz, who also found Dr. Haas uncommunicative.

After this operating room incident, Dr. Haas relinquished his privileges, and he was granted a one year leave of absence, effective May 24, 2001.  Dr. Haas, in an effort to gain reinstatement, asked Dr. Berger to write a letter concerning his condition, which Dr. Berger did in August 2001.  The letter opined that Dr. Haas was presently not exhibiting any active mental disease.  (Pl.'s Ex. 61.)  In November 2001, Dr. Berger wrote advising the hospital that he was unable to clear Dr. Haas for practice.  (D.'s Ex. 27.)  The letter stated in part that "[a]s to whether Dr. Haas had a psychiatric problem, I am unable to make that determination and say whether a psychiatric problem existed.  Therefore, I am unable to psychiatrically clear him."  (D.'s Ex. 27.)  The letter also states, however, "[that] on interview with me, the patient showed no evidence [of] any Axis I psychiatric disorder. As to Axis II issues, i.e. his personality, the patient does tend to be rather introspective and socially naive in his interactions.  However, I do not believe that this reaches the threshold which could be considered a disorder and/or a disease."  (D.'s Ex. 27.)  Five days later, the Credentials Committee advised Dr. Haas he would need unequivocal psychiatric clearance before he could be considered for reinstatement.  (Pl.'s Ex. 39.)

Thereafter, Dr. Haas engaged Dr. Kelly J. Felins in an effort to gain psychiatric clearance.  By letter of June 26, 2002, Dr. Felins wrote to Dr. Thomas Campbell. (Pl.'s Ex. 44.)  No reinstatement was granted as a result of the June 26, 2002 Felins letter. The letter opined "Regarding Dr. Haas's clinical abilities: I have no way of judging his surgical skills but find that he is quite capable of problem-solving.  My reservation would be that under stress, he may have difficulty relating to patients or staff.  I recommend that this possibility be directly evaluated, if possible, before making any decisions to resolve

4

this matter." (Pl.'s Ex. 44.)  Dr. Felins wrote a second letter on November 4, 2002, in

which she "strongly recommended" that Dr. Haas end his voluntary leave and return to

work without restrictions. (Pl.'s Ex. 50.)  This letter stated, in its entirety:

> This letter is a follow-up regarding Jonathan Haas, M.D.
> Since my last letter he has followed up fully with my
> recommendations to enter into treatment with Dominic Mazza,
> M.D. and continues in weekly psychotherapy.
>
> His personality disorder is stable and in no way should
> interfere with his return to work.  I therefore recommend
> strongly that he end his voluntary medical leave and return to
> work without restrictions as soon as possible.

(Pl.'s Ex. 50.)   In the meantime, Dr. Haas had been treated by Dr. Mazza, a psychiatrist,

for his bipolar disorder.  On November 27, 2002, Dr. Mazza wrote a letter indicating that

Dr. Haas was making satisfactory progress, and that he supported Dr. Felins'

recommendation. (Pl.'s Ex. 53.)  Dr. Mazza's letter, in its entirety, stated "Dr. Jonathan

Haas is a patient of mine in individual psychotherapy and is making satisfactory progress.

I am aware of Dr. Felins' evaluation and recommendations and support those."  (Pl.'s Ex

53.)  On December 4, 2002, the Credentials Committee recommended that Dr. Haas'

privileges be reinstated with the conditions that he be supervised/assisted in the

operating room for a period of six months by a Board Certified Orthopedic Surgeon who

was on the staff of the hospital; that Dr. Haas was responsible for securing such an

orthopedic surgeon; that Dr. Haas continue with his psychiatric treatment; and, that his

treating psychiatrist provide periodic reports of his progress to the hospital.  (Pl.'s Ex. 54.)

Dr. Haas was notified of these conditions for reinstatement by letter of December 18,

2002 from Dr. Host, the Chief Executive Officer of WVHCS.  (Pl.'s Ex. 55.)

Dr. Haas was unable to secure an orthopedic surgeon to supervise him in the

operating room.  Dr. DePasquale, the Chief of Surgery at the hospital, and a general

surgeon, volunteered to accompany him, but the hospital required an orthopedic surgeon,

viewing a general surgeon as not being qualified to do orthopedic surgery of the type

performed by Dr. Haas.

Dr. Haas informed the hospital he was unable to obtain a qualifying orthopedic

surgeon, and requested that this condition be eliminated.  The hospital did not respond to

Dr. Haas in this regard.


**LEGAL STANDARD**

**I.      Judgment as a Matter of Law - Standard**

Under Rule 50(b), a party may renew its request for a motion for judgment as a

matter of law by filing a motion no more than ten (10) days after judgment is entered.

*See* FED. R. CIV. P. 50(b).  In the present case, Defendants' Rule 50(b) motion was timely

filed in accordance with the Court's May 1, 2007 Order setting post-trial briefing

deadlines.  (Docs. 131, 148.)  Judgment notwithstanding the verdict should be granted

sparingly.  *See Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir. 1993).  In

deciding whether to grant a Rule 50(b) motion:

> the trial court must view the evidence in the light most
> favorable to the non-moving party, and determine whether the
> record contains "the minimum quantum of evidence from
> which a jury might reasonably afford relief."  The court may not
> weigh evidence, determine the credibility of witnesses or
> substitute its version of the facts for that of the jury.  The court
> may, however, enter judgment notwithstanding the verdict if
> upon review of the record, it can be said as a matter of law
> that the verdict is not supported by legally sufficient evidence.

*Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691-92 (3d Cir. 1993),

*abrogation on other grounds recognized by United Artists Theatre Circuit, Inc. v. Twp. of*

*Warrington, Pa.*, 316 F.3d 392 (3d Cir. 2003) (citations omitted).  The question is not

whether there is literally no evidence supporting the non-moving party, but whether there

is evidence upon which the jury could properly find for the non-moving party.  *See Walter,*

985 F.2d at 1238 (citing *Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir. 1978)).


## DISCUSSION

### I.    Standing

The Defendant WVHCS first argues that it is entitled to judgment as a matter of

law because Dr. Haas is a non-employee seeking medical staff privileges at the hospital.

For that reason, Defendant argues that Dr. Haas is not a member of the protected class

of individuals under the Rehabilitation Act or the ADA.  The Defendant WVHCS cites

*Wojewski v. Rapid City Reg'l Hosp.*, 450 F.3d 338 (8th Cir. 2006), an Eighth Circuit Court

of Appeals case in support of its theory.  In *Wojewski*, the plaintiff physician sued the

defendant hospital alleging that the termination of his privileges at the hospital violated

Title I of Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

The Eight Circuit Court of Appeal's analysis focused first on the plaintiff physician's

standing under Title I of the ADA.  First, the court noted that Title I of the ADA deals

solely with employment discrimination actions.  The plaintiff physician was a member of

the medical staff, which permitted him to admit patients, use the hospital's facilities, and

perform surgeries.  *Id.* at 340.  However, the plaintiff physician also leased separate

office space and maintained his own staff. *Id.* The defendant hospital did not bill patients for the plaintiff's services, and the hospital did not pay the plaintiff. *Id.* The plaintiff physician was later diagnosed with bipolar disorder, and took a leave of absence. *Id.* Later that year, the defendant hospital reinstated the plaintiff physician subject to certain conditions. *Id.* After reinstatement, the plaintiff physician experienced an acute episode during surgery, and the defendant hospital terminated the plaintiff physician's medical staff privileges. *Id.* at 341.

In *Wojewski*, the Eighth Circuit Court of Appeals affirmed the district court's grant of summary judgment, finding that the plaintiff physician did not have standing under Title I of the ADA because he was not an employee of the hospital, but an independent contractor. *Id.* at 342. Such a finding was based upon the facts that the plaintiff physician maintained its own office and was not paid by the hospital. *Id.* Furthermore, the court held that given the similarity between the ADA and the Rehabilitation Act, the court would decline to extend coverage of the Rehabilitation Act to independent contractors in this scenario. *Id.* at 345.

In comparison, Plaintiff cites *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113 (3d Cir. 1998). In this Third Circuit Court of Appeals case, the court considered whether Title III of the ADA granted a cause of action to a plaintiff physician with staff privileges. The court noted that "it is evident that Congress sought to regulate disability discrimination in the area of employment exclusively through Title I, notwithstanding the broad language of Title III." *Id.* at 118-19. The court found that the plaintiff properly stated a cause of action as an individual within the meaning of Title III. *Id.* at 121.

8

In this case, Plaintiff Dr. Haas brought his cause of action pursuant to Title III of the ADA, and not Title I.  As Title III is the applicable provision in this case, *Menkowitz* is the controlling law.  Although *Wojewski* is persuasive authority on the standing of such a plaintiff to bring a Title I claim, it is inapplicable to the Plaintiff's standing under Title I. *Menkowitz* specifically distinguished between Title I and Title III of the ADA in its decision, holding that "a medical doctor with staff privileges - one who is not an employee for purposes of Title I - may assert a cause of action under Title III of the ADA as an 'individual' who is denied the 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.'" *Id.* at 122.  Therefore, Plaintiff does have standing to bring a claim pursuant to Title III of the ADA.  The Third Circuit Court of Appeals also discussed standing pursuant to Section 504 of the Rehabilitation Act.  The court held that "nothing in the Rehabilitation Act would prevent a physician with staff privileges from asserting a cause of action based on disability discrimination."  *Id.* at 123 (citing *Landefeld v. Marion Gen. Hosp.*, 994 F.2d 1178 (6th Cir. 1993)).

For these reasons, Plaintiff Dr. Haas has standing to sue the Defendant WVHCS under both Title III of the ADA and Section 504 of the Rehabilitation Act.

## II.       Elements of a Claim - The Rehabilitation Act and the ADA

Section 504 of the Rehabilitation Act provides that "No otherwise qualified individual with a disability in the United States, as defined in Section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance."

To establish a clam, plaintiff must show that: (1) he is an individual with a disability;
(2) he is otherwise qualified for participation in the program or activity, or for the position
sought; (3) he was excluded from the position sought, denied the benefits of, or subject to
discrimination under the program or activity "solely by reason of his [or her] handicap;"
and (4) the relevant program or activity receives federal financial assistance. *Menkowitz*,
154 F.3d at 123 (citing *Strathie v. Dep't of Transp.*, 716 F.2d 227, 230 (3d Cir. 1983);
*Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1009 (3d Cir. 1995)).

Plaintiff also must show that a reasonable accommodation is possible. *Donahue
v. Consul. Rail Corp.*, 224 F.3d 226, 229 (3d Cir. 2000).  For a disparate treatment claim,
a plaintiff must also show by a preponderance of the evidence that others not in his
protected class were treated differently.  *Logan v. Potter*, 2007 WL 1652258 (D.N.J. June
6, 2007 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

In defense, the Defendant bears the burden of proving that the accommodations
requested by the plaintiff are unreasonable, or would cause an undue burden on the
employer.  *Donahue*, 224 F.3d at 229.  The burden also shifts to the defendant to show a
legitimate, non-discriminatory reason for the adverse employment act.  *St. Mary's Honor
Ctr. v. Hicks*, 509 U.S. 506, 508-10 (1993).  However, the ultimate burden remains with
the plaintiff.  Once the employer satisfies the burden of production by introducing
evidence of a legitimate non-discriminatory reason for the action, plaintiff must prove by a
preponderance of the evidence that the proffered reasons were pretextual.  *Id.*

In this case, the final factor, whether the Defendant received federal funds or

10

assistance, is undisputed.  The remaining issues concern the other three factors: whether the Plaintiff was disabled, whether the Plaintiff was otherwise qualified, and whether the Plaintiff was excluded solely by reason of his disability.

In contrast, the ADA provides that "No individual shall be discriminated against on the basis of disability, in the full and equal employment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

To establish liability under this section, a Plaintiff must prove that he: (1) has a disability; (2) was discriminated against on the basis of that disability; (3) was thereby denied goods or services; (4) by a place of public accommodation by the owner or operator of that facility.  *Little v. Lycoming County,* 912 F. Supp. 809, 818 (M.D. Pa. 1996) (McClure, J.).

A.      Disability

Defendant's first argument is that Plaintiff Haas failed to prove that he had a disability pursuant to the Rehabilitation Act or the ADA, and failed to prove that he was substantially limited in his ability to think.  However, in the Court's Memorandum and Order of December 6, 2006 denying the Defendant's motion for summary judgment, the Court found that the Plaintiff had a disability as defined in the text of the Americans with Disabilities Act ("ADA").  The Court held that "Dr. Haas' mental condition could fairly be considered a substantial limitation on his ability to work in his profession as a surgeon, because no remedial measures (*i.e.,* medication) could be taken to correct this disability." *Haas v. Wyoming Valley Health Care System*, 465 F. Supp. 2d 429, 434 (M.D. Pa. 2006).

11

Furthermore, the Court noted that in its memorandum in support of the motion for summary judgment, Defendant conceded that Plaintiff satisfied this prong of the analysis. However, even presuming that Plaintiff satisfied his burden of proving disability, he has failed to show that he is "otherwise qualified" or that the treatment occurred "solely by reason of" his disability.  The definition of "individual with a disability" under the Rehabilitation Act is the same as that under the ADA, and therefore the finding of disability within the ADA requires a finding of disability pursuant to the Rehabilitation Act. *See* 29 U.S.C. § 705(20)(B).

> B.    "Direct Threat"

Defendant further argues that the Plaintiff was not "otherwise qualified" pursuant to the Rehabilitation Act because Plaintiff's condition presented a "direct threat" to the patients of the WVHCS, and the modifications required to eliminate this threat would fundamentally alter the nature of the WVHCS's goods and services.  Similarly, Defendant WVHCS argues that the modification of the assistance of a general surgeon requested by Plaintiff is not required because Dr. Haas poses a "direct threat to the health and safety of others."  42 U.S.C. § 12182(b)(3). The concept of "direct threat" under the Rehabilitation Act is the same as under the ADA.[2]  Therefore, Defendant's direct threat defense under the ADA applies equally here to Plaintiff's claim under the Rehabilitation

---

[2] *See* 28 C.F.R. Pt. 36, App. B (explaining that the direct threat exception, which was later codified in Title III of the ADA, was adopted from the Supreme Court's holding in *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 (1987)).  In *Arline*, the Supreme Court reconciled the contrary objectives of prohibiting discrimination against individuals with disabilities with protecting others from significant health and safety risks posed by those individuals by finding that the Rehabilitation Act did not to require the hiring of a person who posed "a significant risk of communicating an infectious disease to others."  *Id*. at 287 n.16.

12

Act.

       *1.    Standard*

      The Third Circuit Court of Appeals has held that, with respect to the Rehabilitation

Act, "[a] handicapped individual who cannot meet all of the program's requirements is not

otherwise qualified if there is a factual basis in the record reasonably demonstrating that

accommodating that individual would require either a modification of the essential nature

of the program, or impose an undue burden on the recipient of federal funds." *Strathie*,

716 F.2d at 231.

      The United States District Court for Eastern District of Pennsylvania considered

the importance of health and safety of others with respect to the Rehabilitation Act in

*Taylor v. Garrett*, 820 F. Supp. 933 (E.D. Pa. 1993).  "As the implementing regulations

promulgated by the EEOC make clear, whether a handicapped person can be classified

as a 'qualified handicapped person' for whom reasonable accommodation must be made

requires consideration of the demands of a particular job - i.e., the handicapped

employee's ability to 'perform the essential functions of the position in question without

endangering the health and safety of the individual or others. . . .'" *Id.* at 935 (citing 29

C.F.R. § 1613.702(f) (1992)) (emphasis omitted).

      The Supreme Court case of *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273,

276 (1987) first dealt with the issue of a "direct threat" with respect to the Rehabilitation

Act.  In *Arline,* a teacher with tuberculosis challenged her dismissal by the school board

on the basis of her disease.  The Court held that although the Plaintiff was handicapped

within the meaning of the statute, there was a question as to whether she was "otherwise

qualified" to perform the duties of the job.

In *Arline*, the Supreme Court held that "[a] person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk. *Id.* at 287 n. 16.  Furthermore, the *Arline* Court stated that the test effectuated Section 504's "goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns . . . as avoiding exposing others to significant health and safety risks." *Id.* at 287.  In determining whether a person would be otherwise qualified under these factors, the court should consider: (1) the nature of the risk; (2) the duration of the risk; (3) the severity of the risk; and (4) the probabilities the disease will be transmitted and will cause varying degrees of harm.  *Id.* at 288.

The Third Circuit Court of Appeals case of *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293 (3d Cir. 2007) further discussed the significant risk, or "direct threat" test developed in *Arline*.  The court noted that, although the *Arline* decision was limited to cases of infectious diseases, other courts have expanded the test to "where a disability created a significant risk to the health or safety of others." *Id.* at 305 (citing *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295-96 (5th Cir. 1998) (attention deficit hyperactive disorder); *EEOC v. Amego, Inc.*, 110 F.3d 135, 143-45 (1st Cir. 1997) (depression); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996) (diabetes); *Palmer v. Cir. Ct. Of Cook County*, 117 F.3d 351, 353 (7th Cir. 1997) (violent employees); *Donahue v. Consol. Rail Corp.* 224 F.3d 226, 231 (3d Cir. 2000) (epileptics

14

operating potentially dangerous machinery)).  Furthermore, Congress has amended the ADA and the Rehabilitation Act to include provisions containing an exception if the disability "poses a direct threat to the health or safety of others."  42 U.S.C. § 12182(b)(3); 29 U.S.C. § 705(20)(D).

In *Ross v. Beaumont Hosp.*, 687 F. Supp. 1115 (E.D. Mich. 1988), the court considered a Rehabilitation Act claim brought by a physician suffering from narcolepsy. In finding that the defendant hospital had a prudential concern, the court noted that:

> "Where the lives of critically ill patients are at stake, public policy may dictate exclusion if there is any doubt concerning an individual's ability to serve such patients.  To use the allocation of the burden of proof as a means of addressing this concern, however, would be a mistake.  There are more suitable methods of analysis to protect valid exclusions.  As previously discussed, program operators may establish eligibility criteria that reflect legitimate needs to ensure the public safety.  A nursing or medical school is entitled to ensure that persons who serve as hospital staff present no significant safety risk to patients.  A medical school might legitimately contend that no individual who may foreseeably cause injury to patients should be permitted on its staff.  If it can then demonstrate, for example, that an individual with a history of mental disability may foreseeably cause significant injury, it will have carried the requisite burden of persuasion."

*Id.*  (quoting Judith Welch Wegner, *The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity Without Respect to Handicap Under Section 504 of the Rehabilitation Act of 1973*, 69 CORNELL L. REV. 401, 490 (1984)).

Similarly, Title III of the ADA requires a place of public accommodation to make reasonable modifications to its policies, practices, and procedures where necessary to ensure full and equal access to its services by disabled individuals.  42 U.S.C. 12182(b)(2)(A)(ii).  However, the "reasonable modifications" requirement is subject to

15

several limitations.  Most applicable here, modifications are not required if doing so would

pose a "direct threat to the health and safety of others."  42 U.S.C. § 12182(b)(3).  *Beale*

*v. Aardvark Day Care Ctr.*, No. 00-CV-413, 2000 WL 33119418, at *5 (E.D. Pa. Dec. 29,

2000).

       2.     *Application of Standard*

To determine if Plaintiff Haas posed a "direct threat" to the patients, the four

factors enunciated by the Supreme Court in *Arline* must be considered.  In this case, the

nature of the risk involves the life and health of the patients that Plaintiff Haas is treating

or operating on.  The duration of the risk lasts throughout the time of the procedure and

treatment.  The severity of the risk is very high, as if Plaintiff Haas had an episode during

surgery, the patient could be severely injured or die.

The fourth factor considers the probability of the risk occurring.  On May 23, 2001,

an episode occurred in the operating room during a surgical procedure.  Dr. Haas had a

psychotic episode in the operating room, became confused, and required significant

assistance to complete a total knee replacement.  (Prebish Trial Tr. Vol. 3, 106:10-111:6,

112:10-12, 112:18-21, 114:18-21, Apr. 4, 2007, Doc. 140; Harris Trial Tr. vol. 3 225:20-

226:24, Apr. 4, 2007, Doc. 140; McCarty Trial Tr. vol. 3 255:12-259:17, Apr. 4, 2007,

Doc. 140; Davenport Trial Tr. vol. 3, 201:19-204:23, Apr. 4, 2007, Doc. 140; Amory Trial

Tr. vol. 4 185-191:23, Apr. 5, 2007, Doc. 141.)  The testimony included statements that

"He had a hard time . . . remembering things, turning his back, I remember, on the sterile

field and just dazing." (Prebish Trial Tr. vol. 3, 106:14-18, Apr. 4, 2007, Doc. 140.)  Nurse

Michelle Davenport testified that Dr. Haas had "an erratic thought process, not being able

16

to concentrate." (Davenport Trial Tr. vol. 3, 210:5-6, Apr. 4, 2007, Doc. 140.)  The

representative from the prosthetics company, Jay Amory, testified that he had lost "his

ability to concentrate" and "did not understand what I was trying to explain." (Amory Trial

Tr. vol. 4, 189:13-17; 186:14-15, Apr. 5, 2007, Doc. 141.)

     After the surgery, Dr. Raklewicz approached Dr. Haas, and noted that he went on

to ask the same question several times in conversation with other doctors.  (Raklewicz

Trial Tr. vol. 3, 147:21-148:618, Apr. 4, 2007, Doc. 140.)  Dr. Raklewicz also testified that

"He just seemed dazed. . . I'm still convinced that I really don't think he knew who I was at

that time, which really concerned me." (Raklewicz Trial Tr. vol. 3, 148:14, 16-18, Apr. 4,

2007, Doc. 140.)

     Dr. Haas further testified that he felt abnormal at the time of surgery, but

proceeded despite this feeling.  (Haas Trial Tr. vol. 2, 205:15-206:25, Apr. 3, 2007, Doc.

139.)  Specifically, he stated that he felt as if he were "[i]n an elated state, somewhat

agitated.  The thought process, somewhat sped up." (Haas Trial Tr. vol. 2, 205:25-206:1,

Apr. 3, 2007, Doc. 139.)

     However, Plaintiff notes that with regard to the May 23rd incident, Dr. Haas

performed the operation from start to finish.  (Prebish Trial Tr. vol. 3, 113:1-3, Apr. 4,

2007, Doc. 140.)  Dr. Haas received assistance during the surgery from a Physician's

Assistant.  (Prebish Trial Tr. vol. 3, 16:18-17:11, Apr. 4, 2007, Doc. 140.)  During the

operation, the Physician's Assistant inserted the pin into the femoral block and closed the

skin, which are duties normally completed by a Physician's Assistant, according to Dr.

Haas.  (Haas Trial Tr. vol. 2, 16:18-17:11, Apr. 3, 2007, Doc. 139.)  Furthermore, Plaintiff

notes that this operation was successful.  (Davenport Trial Tr. vol. 3, 204:24-205:1, Apr.

4, 2007, Doc. 140; Racklewicz Trial Tr. vol. 3, 161:3-7, Apr. 4, 2007, Doc. 140.)  Plaintiff

points to testimony that the patient was not at risk during the surgery, and had the patient

been at risk, a telephone was available in the operating room.  (Prebish Trial Tr. vol. 3,

132:16-133:5; 133:10-12, Apr. 4, 2007, Doc. 140.)  Plaintiff argues that several witnesses

also testified that the patient was not at risk during the operation, and that Dr. Haas was

not a direct threat to the patient.  (Davenport Trial Tr. vol. 3, 204:4-6, Apr. 4, 2007, Doc.

140; Harris Trial Tr. vol. 3, 244:19-21, Apr. 4, 2007, Doc. 140; McCarty Trial Tr. vol. 3,

263:9-17, Apr. 4, 2007, Doc. 140.)

        However, Plaintiff does not mention other relevant testimony by the nurses.  First,

Nurse Davenport stated that she had never seen a surgical assistant place a prosthesis

in a patient before this time.  (Davenport Trial Tr. vol. 3, 204:13-15, Apr. 4, 2007, Doc.

140.)  Nurse Davenport also testified that the patient was safe "because of the staff that

he had around him, the procedure was able to continue on because of their help."

(Davenport Trial Tr. vol. 3, 204:8-11, Apr. 4, 2007, Doc. 140.)  Despite Plaintiff's

argument that Ms. Harris testified that Plaintiff Haas was not a direct threat to the patient

(Harris Trial Tr. vol. 3, 244:19-21, Apr. 4, 2007, Doc. 140), review of her testimony

reveals that Ms. Harris stated that the patient was at risk, although it was not life-

threatening.  (Harris Trial. Tr. vol. 3, 242:25-7, Apr. 4, 2007, Doc. 140.)  Furthermore, to

complete the surgery, Dr. Haas needed prompting from the prosthesis manufacturer's

representative, Mr. Armory, and the Physician's Assistant, Eric Stover.  (Davenport Trial

Tr. vol. 3, 212:1-13, Apr. 4, 2007, Doc. 140.)  Nurse Davenport testified that Dr. Haas

required step-by-step instruction in completing the surgery.  (Davenport Trial Tr. vol. 3,

212:1-13, Apr. 4, 2007, Doc. 140.)

18

The fact that this particular incident did not result in harm to the patient does not establish that Dr. Haas did not pose a direct threat to his patients.  Rather, the question is whether an occurrence of such an episode could result in harm to a patient.  There are numerous facts in evidence that show that such an episode could potentially occur again.

The Defendant WVHCS presented testimony demonstrating that it considered the nature, duration, and severity of the risk to patients when making their decision imposing conditions on Dr. Haas' return.  (DePasquale Trial Tr. vol. 2, 171:3-7, Apr. 3, 2007, Doc. 139; Smith Trial Tr. vol. 4, 137:4-7, Apr. 5, 2007, Doc. 140; Campbell Trial Tr. vol. 4, 78:8-19, Apr. 5, 2007, Doc. 141.)  Plaintiff Haas attempted to demonstrate his ability to return to the Hospital through two (2) letters from psychiatrists.  The Hospital considered the probability of the episode recurring based upon these two (2) letters:  Dr. Felins' November 2002 letter and Dr. Mazza's November 2002 letter.   (Pl.'s Exs. 50, 53.)  Dr. Campbell testified that Dr. Felins told him that she was not Dr. Haas' treating physician and he was not her patient.  (Campbell Trial Tr. vol. 4, 74:6-9, Apr. 5, 2007, Doc. 141.) Dr. Smith also testified as to the WVHCS's view of the letters received from Dr. Mazza and Dr. Felins.  Dr. Smith testified that Dr. Felins' letter was not sufficiently convincing that Dr. Haas would be able to return safely.  (Smith Trial Tr. vol. 4, 127:7-10, Apr. 5, 2007, Doc. 141.)  Dr. Smith further testified that Dr. Mazza's note was brief, and thus also unconvincing.  (Smith Trial Tr. vol. 4, 127:10-11, Apr. 5, 2007, Doc. 141.)  Furthermore, Dr. Smith testified that neither letter stated "that Dr. Haas could come back in any particular timeframe with complete assurance of safety, or reasonably complete assurance of safety."  (Smith Trial Tr. vol. 4, 127:12-15, Apr. 5, 2007, Doc. 141.)

The Hospital also considered Dr. Berger's report.  (Campbell Trial Tr. vol. 4, 69: 7-

23, Apr. 5, 2007, Doc. 141.)  Dr. Campbell testified that "in [Dr. Berger's] letter he put a

disclaimer that if an incident happened on 5/23 then he would withhold his

recommendation in so many words."  (Campbell Trial Tr. vol. 4, 69:14-17, Apr. 5, 2007,

Doc. 141.)

Therefore, the Defendant WVHCS had a legitimate concern regarding patient

safety.  Numerous witnesses testified regarding the issue of patient safety, including Dr.

DePasquale, Dr. Smith, and Dr. Campbell.  (DePasquale Trial Tr. vol. 2, 161:20-23,

171:3-7, Apr. 3, 2007, Doc. 139; Smith Trial Tr. vol. 4, 137:4-7, Apr. 5, 2007, Doc. 141;

Campbell Trial Tr. vol. 4, 78:8-19, Apr. 5, 2007, Doc. 141.)  Dr. Haas has argued that

patient safety would have been realized by the oversight of Dr. DePasquale during

surgery, and therefore the conditions were a pretext for the discrimination.  However, the

Defendant WVHCS has raised two (2) points as to why Dr. DePasquale's assistance

would not be the type of accommodation to eliminate the direct threat.  First, Dr.

DePasquale testified that "I volunteered to act as an assistant to Dr. Haas with all of his

cases. . . I never said I would supervise.  I said that I would assist."  (DePasquale Trial Tr.

vol. 2, 155:8-9; 172:19-24, Apr. 3, 2007, Doc. 139.)  Furthermore, Dr. DePasquale

testified that he was not board-certified in orthopedic surgery, nor did he have privileges

in orthopedic surgery.  (DePasquale Trial Tr. vol. 2, 171:14-23, Apr. 3, 2007, Doc. 139.)

The Defendant WVHCS has also presented an abundance of evidence regarding

the requirement of having an orthopedic surgeon supervising Dr. Haas for reasons of

patient safety.  For example, Dr. Smith testified that a general surgeon, psychiatrist,

internist or pediatrician is not qualified to do the type of procedures that an orthopedic

surgeon performs. (Smith Trial Tr. vol. 4, 138:21-139:15, Apr. 5, 2007, Doc. 141.)

20

Furthermore, Dr. Campbell testified that the training and education of an orthopedic surgeon differs from that of a general surgeon. (Campbell Trial Tr. vol. 4, 77:13- 78:7, Apr. 5, 2007, Doc. 141.)  Furthermore, Dr. Campbell stated that he would not advise any of his own patients to undergo an orthopedic surgery with a general surgeon.  (Campbell Trial Tr. vol. 4, 77:13-78:7, Apr. 5, 2007, Doc. 141.)  The Executive Committee also determined that it was important to have an orthopedic surgeon present at surgery, rather than wait for one should a problem arise, especially because the patient would be under anesthesia.  (Smith Trial Tr. vol. 4, 138:21-139:15, Apr. 5, 2007, Doc. 141.)

For these reasons, Dr. Haas is not "otherwise qualified" within the meaning of the Rehabilitation Act, as he posed a direct threat to the health and safety of the patients in the WVHCS.  Similarly, he posed a "direct threat" within the meaning of the ADA. Discrimination on the basis of a disability is permitted when the disability poses a "direct threat" to the health and safety of others that cannot be eliminated by a modification of policies, practices, or procedures, or the provision of additional aids or services.  *See Doe v. County of Centre*, 242 F.3d 437, 447 (3d Cir. 2001).  Therefore, WVHCS's disparate treatment of Dr. Haas, such as the requirement that he be supervised by another orthopedic surgeon, is permissible.  Dr. Haas argues that the failure of the Hospital to allow Dr. DePasquale to assist in Plaintiff's procedures, or the failure to allow Dr. Haas to operate on his own, constitutes failure to provide a reasonable modification.  However, as discussed *supra*, such a modification would not be reasonable in the light of patient safety.

No reasonable juror could find that Dr. Haas did not pose a direct threat to the health and safety of his patients.  Furthermore, no reasonable jury could find that the

21

substitution of a supervising general surgeon would be a reasonable accommodation for orthopedic surgeries, which require special education and training.

I do not take lightly the determination that I have made that no reasonable juror could find that Dr. Haas did not pose a direct threat to patient safety, and was therefore not otherwise qualified to perform as an orthopedic surgeon at the relevant time period, and likewise that no reasonable juror could find that a supervising general surgeon was a reasonable accommodation.  I say so because it is an overturning of a jury verdict in favor of Dr. Haas on these issues, and my reverence for the jury's wisdom as the foundation of our trial system is deeply rooted in conviction.  But there are those rare occasions where legal principles - here patient safety and reasonable accommodation - are clear as matters lacking in the ingredient of differences among reasonable people and are so clear that the Court must intervene and say so.  This is such a case.

Therefore, the Defendant WVHCS is entitled to judgment as a matter of law on the Rehabilitation Act claim, and Defendant's motion will be granted.  Plaintiff will also be denied his request for equitable relief pursuant to the ADA.

### III.     Motion for New Trial and Motion for Attorney's Fees

Because the standard for granting a new trial is "lower" than that for entering judgment as a matter of law, if a party satisfies the standard for judgment as a matter of law, it is unnecessary to order a new trial.  *Markovich v. Bell Helicopter Textron, Inc.*, 805 F. Supp. 1231 (E.D. Pa. 1992).  Therefore, as Defendant has satisfied the requirements for judgment as a matter of law, the Court need not address whether Defendant is entitled to a new trial.

22

Plaintiff also requested attorney's fees, costs and other expenses pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k) and Federal Rule of Civil Procedure 54(d)(2). However, these provisions hold that the "prevailing party" is entitled to attorney's fees. Plaintiff is not a prevailing party, as judgment as a matter of law will be entered on the damages claims pursuant to the Rehabilitation Act, and Plaintiff will be denied equitable relief pursuant to the ADA.  Therefore, Plaintiff's claim for attorney's fees and costs will be denied.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for judgment as a matter of law on the Rehabilitation Act will be granted, as Plaintiff posed a "direct threat" to the health and safety of the patients of WVHCS.  For the same reasons, Plaintiff will be denied equitable relief under the ADA.  As the Court has granted judgment as a matter of law for the Defendant, it need not reach the Defendant's motion for a new trial.  Finally, Plaintiff's motion for attorney's fees will be denied, as Plaintiff is not a prevailing party as required by statute.

An appropriate Order follows.

March 31, 2008                              /s/ A. Richard Caputo
Date                                        A. Richard Caputo
                                            United States District Judge

23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JONATHAN HAAS, M.D.,

     Plaintiff,

       v.

WYOMING VALLEY HEALTH SYSTEM,

     Defendant.

NO. 3:03-CV-1966

(JUDGE CAPUTO)

## ORDER

    **NOW**, this  31st  day of March, 2008, **IT IS HEREBY ORDERED** that:

    (1)    Defendant's Motion for a Judgment as a Matter of Law (Doc. 124) is **GRANTED**.

    (2)    Plaintiff's Request for Equitable Relief pursuant to the ADA (Doc. 137) is **DENIED**.

    (3)    Plaintiff's Motion for Attorney's Fees (Doc. 125) is **DENIED**.

    (4)    Judgment shall be **ENTERED** for Defendant.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge